**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BANNER HEALTH,
3200 E. Camelback Road, Suite 300
Phoenix, AZ 85018

BANNER HEALTH PLAN, INC.,
3200 E. Camelback Road, Suite 300
Phoenix, AZ 85018

BANNER-UNIVERSITY CARE ADVANTAGE,
3200 E. Camelback Road, Suite 300
Phoenix, AZ 85018

Plaintiffs,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Avenue, S.W.
Washington, DC 20201,

CENTERS FOR MEDICARE & MEDICAID SERVICES
7500 Security Boulevard
Baltimore, MD 21244,

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201,

MEHMET OZ, in his official capacity as Administrator, Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244,

Defendants.

Civ. No. 26-3944

## COMPLAINT

Plaintiffs Banner Health, Banner Health Plan, Inc. and Banner-University Care Advantage (collectively, Banner) bring this complaint for injunctive and declaratory relief against Defendants the United States Department of Health and Human Services (HHS); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; the Centers for Medicare & Medicaid Services (CMS); and Mehmet Oz, in his official capacity as Administrator of CMS, and allege as follows:

## INTRODUCTION

1. Banner brings this action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, to remedy CMS's unlawful calculation of Banner's 2027 Star Ratings for its Medicare Advantage contracts. As an Arizona-based nonprofit integrated healthcare system that both finances coverage and delivers care, Banner has a direct interest in rigorous, transparent, and lawful quality measurement. Banner seeks the same application of Congress's standards that every Medicare Advantage Organization (MAO) is entitled to receive. Banner's payments should not be artificially reduced by CMS's use of unlawful measures despite Banner's commitment to providing quality care to Medicare beneficiaries.

2. Through the Star Ratings program, CMS annually evaluates the quality and performance of Medicare Advantage plans and assigns ratings ranging from one to five Stars. Those ratings carry serious consequences: they not only inform beneficiaries' decisions about which plan to select but also directly determine the federal funding available to participating plans. Even a half-Star difference can deprive an MAO of tens of millions of dollars, impair its ability to offer competitive benefits and premiums, and damage its reputation. Even more importantly, those funds are critically important for beneficiaries. MAOs use federal funding to reduce premiums and cost-

sharing, offer supplemental benefits, improve access to care, and make other member-focused investments. An unlawful rating therefore has consequences for beneficiaries beyond an insurer's bottom line.

3. Banner's Medicare Advantage plans are provider-sponsored. Banner owns and operates hospitals, ambulatory care centers, clinics, and employed physician groups through which many of Banner's members receive their care. Thus, Banner has a direct interest in ensuring that its beneficiaries have access to quality care. Banner has aligned its care delivery with value-based reimbursement, organizing care around the long-term health of the populations it serves rather than episodic treatment. That alignment is possible because Banner both insures its members and delivers much of their care.

4. Banner provides Medicare Advantage coverage to approximately 18,350 beneficiaries through two contracts with CMS—Contract Nos. H4931 and H5843. For 2027 Star Ratings, CMS assigned H4931 a 3.5 Star Rating and H5843 a 3.0 Star Rating—when both H4931 and H5843 should have been assigned at least a 4.0 Star Rating.

5. Instead, Banner's 2027 Star Ratings were unlawfully calculated, in two ways.

6. *First*, Congress expressly limited the data CMS may use to determine Star Ratings for quality bonus payment (QBP) purposes to data collected under 42 U.S.C. § 1395w-22(e). 42 U.S.C. § 1395w-23(o)(4)(A). Yet CMS calculated Banner's 2027 Star Ratings using measures derived from data outside of Section 1395w-22(e)'s scope, including Independent Review Entity data and Part D prescription drug event data.

7. *Second*, Congress requires CMS to promulgate substantive legal standards governing Medicare payments through notice-and-comment rulemaking. 42 U.S.C. § 1395hh(a)(2). CMS's regulations separately prescribe procedures for new measures and substantive updates to

existing measures. 42 C.F.R. §§ 422.164 and 423.184. But CMS has not promulgated any of the challenged Star Ratings measures in regulation. Instead, CMS merely published the challenged measures' operative specifications in annual Technical Notes and other sub-regulatory materials.

8. A federal court has already held CMS's use of twenty Star Ratings measures unlawful on these grounds. On May 27, 2026, the United States District Court for the Southern District of Georgia held that ten measures exceeded CMS's statutory authority because they relied on unauthorized data sources, while ten additional measures were unlawful because CMS failed to promulgate them through the notice-and-comment rulemaking required by Section 1395hh(a)(2). *Clover Ins. Co. v. HHS*, 2026 WL 1483515, at *8-14, *22-25 (S.D. Ga. May 27, 2026). The court vacated Clover's 2026 Star Rating and ordered CMS to recalculate it without those twenty unlawful measures. *Id.* at *25-26.

9. CMS refused to afford Banner similar relief by removing harmful unlawful measures from its 2027 Star Ratings. Instead, CMS stayed the course, calculating Banner's 2027 Star Ratings using measures specifically held unlawful in *Clover* and measures that are unlawful for materially indistinguishable reasons. Banner specifically asked CMS to remove the harmful unlawful measures and recalculate Banner's 2027 Star Ratings without them. As Banner pointed out, had CMS excluded the harmful unlawful measures, each of Banner's contracts would have received 2027 Star Ratings of at least 4.0 Stars.

10. The difference is substantial. Under the Medicare Advantage statute, contracts rated 4.0 Stars or higher generally qualify for a five-percentage-point increase in the applicable percentage used to calculate their Medicare Advantage benchmarks. 42 U.S.C. § 1395w-23(o). Contracts rated below 4.0 Stars do not qualify for that increase. Moreover, correcting H5843's 2027 rating from 3.0 to 4.0 Stars would increase its applicable rebate percentage from 50% to 65%. 42 U.S.C.

§ 1395w-24(b)(1)(C). Banner estimates that CMS's unlawful determination of its 2027 Star Ratings will deprive it of approximately $28.3 million in funding for 2028—funding that could be passed on to beneficiaries in the form of enhanced benefits, reduced premiums and cost-sharing, and improved care.

11. But CMS categorically refused Banner's request—without explanation and without addressing Banner's arguments at all. Instead, CMS directed Banner to pre-*Clover* sub-regulatory guidance listing the measures (*see* CMS, *Announcement of Calendar Year (CY) 2027 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies* (Apr. 6, 2026)) and stated that "CMS is not excluding any of these measures from the 2027 Star Ratings." CMS nowhere explained how each measure derives only from data within Section 1395w-22(e)'s scope, nor did it explain how each measure was adopted in regulation after notice-and-comment rulemaking as Section 1395hh(a)(2) requires.

12. CMS's approach to Banner's 2027 Star Ratings is thus additionally arbitrary and capricious for three independent reasons. *First*, CMS has apparently calculated Clover's 2027 Star Ratings by excluding unlawful measures that Clover identified as harmful and unlawful. *See* Clover Health Investments, Corp. Form 8-K (Oct. 8, 2026), perma.cc/RC7R-FLQW. CMS refused to do the same for Banner, asserting only that "CMS is not excluding any of these measures from the 2027 Star Ratings." Exs. 3, 4. *Second*, CMS has departed from its prior administrative practice of providing industry-wide relief when courts find aspects of the Star Ratings program unlawful. In 2024, two judges of this Court held that CMS had violated its own regulations when calculating Star Ratings. *See SCAN Health Plan v. HHS*, 2024 WL 2815789, at *6-7 (D.D.C. June 3, 2024); *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 23-25 (D.D.C. 2024). Although those judgments provided relief only to the prevailing plaintiffs, CMS subsequently extended their benefits

to other affected MAOs through an industry-wide recalculation. CMS has not explained why it refuses to adopt a similar approach for 2027 Star Ratings. *Third*, CMS provided *no* response to Banner's explanation as to why each of the harmful measures is unlawful. *Compare* Exs. 1, 2, *with* Exs. 3, 4.

13. Banner accordingly must seek judicial relief to prevent these unlawful measures from continuing to harm Banner and its members. Banner is not seeking special treatment or attempting to avoid accountability for quality. Rather, Banner challenges CMS's unlawful methodology. Star Ratings must be calculated according to the standards Congress itself established, and errors in that methodology have direct consequences for Medicare beneficiaries. CMS's inaccurate and unlawful ratings deprive Banner and its members of substantial financial benefits, deny funding to which Banner would otherwise be entitled, misrepresent the quality of Banner's plans, and place Banner at a competitive disadvantage relative to higher-rated plans.

14. Banner therefore asks this Court to hold the challenged measures unlawful, set aside its 2027 Star Ratings, and direct CMS to recalculate the 2027 Star Ratings without the unlawful measures.

**PARTIES**

15. Plaintiff Banner Health is a section 501(c)(3) Arizona-based nonprofit corporation. Banner Health is one of the nation's largest secular nonprofit healthcare systems, combining a portfolio of hospitals, ambulatory care centers, medical clinics, a comprehensive academic medicine division in partnership with the University of Arizona, and an insurance division. Banner is a fully integrated nonprofit health system with nearly 60,000 employees that serves Arizona and the surrounding region. Banner provides health plan coverage to approximately 1.2 million people.

16. Banner Health, through its wholly owned subsidiaries, furnishes provider-sponsored coverage to Medicare beneficiaries under Parts C and D within an integrated nonprofit system. Banner's Medicare Advantage plans are part of a nonprofit integrated healthcare system in which financing, care delivery, care coordination, population health, and quality improvement all operate under the same organizational umbrella. Banner Health is the parent organization of plaintiff Banner Health Plan, Inc., which operates and administers a Medicare Advantage plan under Contract H5843 with CMS, and plaintiff Banner-University Care Advantage, which operates and administers a dual-eligible special needs Medicare Advantage plan under Contract H4931 with CMS. Together, these plans serve approximately 18,350 individual beneficiaries.

17. Four Banner hospital facilities—where many of Banner's Medicare members receive their care—are Magnet-designated by the American Nurses Credentialing Center. The Magnet designation is awarded for quality patient care and nursing excellence. In 2025, Banner – University Medical Center Phoenix earned its fifth consecutive Magnet designation, placing it in the top one percent of Magnet-designated facilities worldwide.

18. Banner's commitment to its Medicare Advantage plans is personal. Banner team members, parents, spouses, families, and friends along with recently retired team members are among the beneficiaries enrolled in Banner Medicare Advantage plans. These members are served by Banner's nurses and physicians who deliver their care, and by Banner's health plan team members who manage their benefits, coordinate their care, and support them every day. Banner's investment in retaining that workforce is demonstrated by its three consecutive Great Place to Work Certifications, its recognition as one of Fortune's Best Large Workplaces in Healthcare, and its place on Forbes' list of America's Best Employers for Healthcare Professionals.

19. Plaintiff Banner Health Plan, Inc. is an Arizona nonprofit corporation and a wholly owned subsidiary of Banner Health. Banner Health Plan, Inc. operates and administers a Medicare Advantage plan under Contract H5843 with CMS and serves 7,500 members in Maricopa County, Arizona. Contract H5843 received a 2027 Star Rating of 3.0 Stars. *See* Ex. 2.

20. Plaintiff Banner-University Care Advantage is an Arizona nonprofit corporation and a wholly owned subsidiary of Banner Health. Banner-University Care Advantage operates and administers a dual-eligible special needs Medicare Advantage plan under Contract H4931 and serves 10,850 members in Cochise, Gila, Graham, Greenlee, La Paz, Maricopa, Pima, Pinal, Santa Cruz, and Yuma counties in Arizona. Contract H4931 received a 2027 Star Rating of 3.5 Stars. *See* Ex. 1.

21. Defendant United States Department of Health and Human Services (HHS) is a department of the Executive Branch of the United States responsible for administering and overseeing the Medicare program. Its headquarters are located at 200 Independence Avenue, S.W., Washington, DC 20201. HHS has delegated responsibility for administering the Medicare program to CMS.

22. Defendant CMS is a federal agency within HHS that is primarily responsible for administering the Medicare program, including Medicare Advantage and the Star Ratings program. CMS's headquarters are located at 7500 Security Boulevard, Baltimore, Maryland 21244. CMS is responsible for establishing and implementing the Star Ratings methodology, calculating Medicare Advantage contracts' Star Ratings, and determining the quality bonus payments and rebate percentages resulting from those ratings.

23. Defendant Robert F. Kennedy, Jr. is the Secretary of HHS and is sued solely in his official capacity. In that capacity, Secretary Kennedy has ultimate responsibility for the activities of HHS, including the actions challenged in this Complaint.

24. Defendant Dr. Mehmet Oz is the Administrator of CMS and is sued solely in his official capacity. In that capacity, Administrator Oz is responsible for overseeing CMS's administration of the Medicare Advantage program, including the determination and publication of the Star Ratings challenged in this Complaint.

## JURISDICTION AND VENUE

25. Plaintiffs bring this suit under the APA, 5 U.S.C. §§ 701-706. Plaintiffs' prayers for declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. § 2201; the APA, 5 U.S.C. §§ 701-706; and 28 U.S.C. § 1361.

26. This case arises under the laws of the United States. The Court has jurisdiction under 28 U.S.C. § 1331.

27. Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Defendant is an officer or agency of the United States and resides in this District.

28. CMS's determinations of Banner's 2027 Star Ratings constitute final agency action subject to judicial review under the APA, 5 U.S.C. §§ 702, 704. CMS's October 26, 2026, decisions definitively denying Banner's requests to correct its 2027 Star Ratings likewise constitute final agency action.

29. Banner is not required to exhaust administrative remedies because CMS regulations expressly preclude administrative review of challenges to the methodology used to calculate Star Ratings. 42 C.F.R. § 422.260(c)(3)(ii); *see SCAN*, 2024 WL 2815789, at *4 n.3. Nevertheless, Banner presented the statutory objections asserted here to CMS in its October 21, 2026 requests concerning both contracts. Exs. 1, 2. CMS denied those requests on October 26, 2026. Exs. 3, 4.

## FACTUAL ALLEGATIONS

### A. Statutory and regulatory background

#### *1. The Medicare Advantage program*

30. Medicare is a federal health insurance program established under Title XVIII of the Social Security Act to provide healthcare coverage to individuals aged 65 and older, as well as certain individuals with disabilities or other qualifying conditions. *See* 42 U.S.C. § 1395 *et seq.*; *Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4,588 (Jan. 28, 2005).

31. Medicare comprises four principal parts. Part A covers inpatient hospital services, skilled nursing facility care, hospice care, and certain home health services. 42 U.S.C. §§ 1395c-1395i-6. Part B covers physician services, outpatient care, preventive services, and other medical services. *Id.* §§ 1395j-1395w-6. Together, Parts A and B are commonly referred to as "traditional" or "original" Medicare. Medicare Rts. Ctr., *The Parts of Medicare (A, B, C, D)*, Medicare Interactive (Apr. 30, 2025), perma.cc/JCN4-ATW8.

32. Under traditional, fee-for-service Medicare, the federal government reimburses healthcare providers directly for covered services furnished to Medicare beneficiaries. *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021).

33. In 1997, Congress established an alternative to traditional Medicare. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. 251, 275-327. That program, Medicare Advantage or Medicare Part C, permits eligible Medicare beneficiaries to obtain their Medicare benefits through private health insurance organizations that contract with CMS. 42 U.S.C. §§ 1395w-21-1395w-28.

34. Private insurers participating in the Medicare Advantage program are known as MAOs. Rather than receiving fee-for-service reimbursements for individual medical services,

MAOs typically receive predetermined monthly payments from CMS for each enrolled beneficiary and, in return, assume financial responsibility for furnishing covered healthcare services for that beneficiary. 42 U.S.C. § 1395w-23(a); *UnitedHealthcare*, 16 F.4th at 872-873.

35. MAOs must furnish beneficiaries with, at minimum, the benefits provided under traditional Medicare. But MAOs may also offer supplemental benefits not ordinarily covered by traditional Medicare, including dental, vision, and hearing benefits. 42 U.S.C. § 1395w-22(a). These added benefits, together with premiums, cost-sharing requirements, and quality of care, are important means by which MAOs distinguish themselves in the competition for Medicare beneficiaries.

36. To further improve prescription drug access for Medicare beneficiaries, Congress established Medicare Part D to provide prescription drug coverage through private plan sponsors. Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066. Medicare beneficiaries can obtain Part D coverage through a standalone prescription drug plan or through a Medicare Advantage plan that also offers prescription drug coverage, commonly known as a Medicare Advantage-Prescription Drug (MA-PD) plan. 42 U.S.C. § 1395w-101.

37. The Medicare Advantage program operates through an annual bidding process. Each year, MAOs submit bids to CMS estimating the cost of furnishing Medicare-covered benefits to their members during the following contract year. 42 U.S.C. §§ 1395w-23, 1395w-24.

38. CMS establishes geographic benchmark rates against which those bids are evaluated. Generally, when an MAO’s bid falls below the applicable benchmark, CMS pays the organization based on its bid and returns a statutorily determined portion of the difference between the bid and the benchmark as a beneficiary rebate. 42 U.S.C. §§ 1395w-23, 1395w-24.

39. These rebates may be used to finance supplemental benefits, reduce premiums or beneficiary cost-sharing, and otherwise enhance the benefits available to Medicare Advantage enrollees.

***2. Statutory quality requirements***

40. From Medicare Advantage's inception, Congress has required participating organizations to maintain programs designed to measure and improve the quality of care provided to enrollees. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. at 291.

41. Initially, Congress afforded the Secretary of HHS (the Secretary) substantial discretion to identify quality and outcomes measures that the Secretary deemed appropriate for evaluating participating plans. *See* 42 U.S.C. §§ 1395w-22(e)(1), (e)(2)(A)(xii) (1997).

42. This broad discretion created uncertainty and confusion for MAOs because CMS could propose different quality measures and practice standards without a stable, consistent framework governing how plans would be evaluated. The resulting unpredictability made it difficult for MAOs to anticipate the standards against which their performance would be measured.

43. In 2003, Congress fixed the problem by substantially revising the statutory provisions governing Medicare Advantage's quality assurance program. The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 changed the requirements for collecting, analyzing, and reporting quality data and renamed the programs "quality improvement programs." *See* Pub. L. No. 108-173, § 722, 117 Stat. 2066; 42 U.S.C. § 1395w-22(e).

44. In its amendments, Congress expressly limited the types of data that the Secretary could require MAOs to collect as part of the quality improvement program. Section 1395w-22(e)(3)(B)(i) provides that the Secretary "shall not collect under subparagraph (A) data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration other than the types of data that were collected by the Secretary as of November 1, 2003."

45. Congress further provided that the Secretary may change the types of data required under Section 1395w-22(e)(3)(A) only after submitting a report (prepared in consultation with MAOs and private accrediting bodies) to Congress explaining the reason for the change. 42 U.S.C. § 1395w-22(e)(3)(B)(ii).

46. In 2004, CMS acknowledged the constraints placed upon it by Section 1395w-22(e) and announced that it would rely only on its pre-existing metrics systems: the Healthcare Effectiveness Data and Information Set (HEDIS), the Health Outcomes Survey (HOS), and the Consumer Assessment of Healthcare Providers and Systems (CAHPS). *See* 69 Fed. Reg. 46866, 46886 (Aug. 3, 2004); 70 Fed. Reg. 4588, 4634-4635 (Jan. 28, 2005).

47. In 2008, CMS began publishing annual Star Ratings—metrics that measured plan quality by assigning a rating between one and five Stars. *See Medicare Program; Contract Year 2019 Policy and Technical Changes to the Medicare Advantage, Medicare Cost Plan, Medicare Fee-for-Service, the Medicare Prescription Drug Benefit Programs, and the PACE Program*, 83 Fed. Reg. 16440, 16520 (Apr. 16, 2018).

48. In 2010, Congress codified the Star Ratings system by incorporating it into the statutory framework governing quality bonus payments for MAOs. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 3201, 124 Stat. 119, as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1102, 124 Stat. 1029, 1043-46; 42 U.S.C. § 1395w-23(o)(4)(A).

49. In so doing, Congress placed an important constraint on the codified Star Ratings system: Section 1395w-22(e) was to be the sole source of data for quality rating calculations. 42 U.S.C. § 1395w-23(o)(4)(A). Congress deliberately omitted the provision that had previously afforded the Secretary discretion to consider other measures.

### *3. The Star Ratings system and CMS's calculation methodology*

50. In 2011, CMS introduced an "overall" Star Rating that combines health-plan and prescription-drug measures for Medicare Advantage and MA-PD contracts. *See* 83 Fed. Reg. 16440, 16520 (Apr. 16, 2018).

51. CMS calculates Star Ratings using numerous individual quality and performance measures. Some measures address clinical outcomes and preventive care, including screenings and the management of chronic medical conditions. Others evaluate beneficiaries' experiences with their health plans, access to care, customer service, prescription drug use, and administrative performance.

52. Calculating Star Ratings is a complex process involving multiple steps. *See Elevance*, 736 F. Supp. 3d at 8. CMS now publishes its measures and additional calculation details in annual sub-regulatory guidance documents called "Technical Notes," which set forth the applicable measures and other key data used to assign measure-level scores.

53. *First*, CMS calculates a contract's raw performance score on each applicable measure. *SCAN*, 2024 WL 2815789, at *1-2. Raw measure scores are commonly expressed as percentages or other numerical values.

54. *Second*, CMS converts those raw scores into measure-level Star Ratings ranging from one to five stars. *See SCAN*, 2024 WL 2815789, at *1-2. For numerical measures, CMS establishes thresholds, commonly called "cut points," that distinguish among the different star levels. *See* 42 C.F.R. §§ 422.166(a), 423.186(a).

55. To establish many of these cut points, CMS uses statistical methodologies that group contracts according to their relative performance. 42 C.F.R. §§ 422.166(a)(1)-(2), 423.186(a)(1)-(2). Consequently, the measure-level Star Rating assigned to a contract may depend

not only upon the contract's own performance but also upon the performance of other contracts in the relevant comparison group.

56. *Third*, CMS assigns weights to individual measures and calculates weighted averages of the applicable measure-level Star Ratings. CMS uses these weighted averages to calculate Part C and Part D summary ratings and the overall rating for MA-PD contracts. *See* 42 C.F.R. §§ 422.166(c), (d), 423.186(c), (d).

57. Because CMS assigns different weights to different types of measures, a change in score for a heavily weighted measure can have a substantially greater effect upon an organization's overall Star Rating than an equivalent change in a lower-weighted measure.

58. Overall ratings are derived from weighted averages and then assigned in half-Star increments. Thus, including or excluding even a small number of measures can change a contract's overall rating. The 4-Star threshold is most financially consequential. *Infra* ¶¶ 61-68.

59. The measures and their specifications change from year to year. Through guidance or notices, CMS adds, removes, or modifies measures, changes their weights, and revises their specifications. *See, e.g.*, Ctrs. for Medicare & Medicaid Servs., *2027 Part C & D Star Ratings Technical Notes* 1-2 (Sept. 30, 2026), perma.cc/4VD9-WDU2 (2027 Technical Notes). Those changes may alter how contracts are evaluated and affect the resulting summary and overall Star Ratings.

60. For the 2027 Star Ratings, CMS identified 32 Part C measures and 13 Part D measures. 2027 Technical Notes at 136-137. CMS also changed the identifiers assigned to certain measures between the 2026 and 2027 ratings years. *Id.* at 1-2. Accordingly, a measure evaluated in both years may appear under a different alphanumeric designation, even where its name and

general subject matter remain the same. *See, e.g., id.* at 148 (the "Getting Needed Care" measure was redesignated from C22 in 2026 to C21 in 2027).

### *4. The financial and competitive consequences of Star Ratings*

61. Star Ratings have important financial consequences extending well beyond public reporting. Congress incorporated Star Ratings into statutory payment formulas that directly determine the funding available for MAOs to use to reduce premiums and cost-sharing, offer supplemental benefits, and otherwise improve care and quality for their members. *See* 42 U.S.C. §§ 1395w-23(o), 1395w-24(b)(1)(C).

62. *First*, Medicare Advantage plans rated 4 Stars or higher generally qualify for a QBP, implemented through a five-percentage-point increase in the applicable percentage used to calculate their Medicare Advantage benchmarks. 42 U.S.C. § 1395w-23(o). A higher benchmark can significantly increase the amount of funding available to an MAO.

63. *Second*, Congress made the percentage of benchmark savings returned to MAOs as rebates dependent on their Star Ratings. Higher-rated plans get a larger percentage of the difference between their bid and their benchmark back as a rebate: 3 Stars and lower receive 50%; 3.5-4 Stars receive 65%; and 4.5-5 Stars receive 70%. 42 U.S.C. § 1395w-24(b)(1)(C). Rebates can be used to lower patient cost sharing and premiums and to fund supplemental benefits not offered under traditional Medicare.

64. Star Ratings thus directly affect the amount of funding available to Medicare Advantage plans and the benefits they can offer their members. Where a plan's bid falls below its benchmark, the QBP benchmark bump increases the amount available for rebates, which can be used to provide more generous benefits or reduce beneficiary costs. Where a plan's bid exceeds its benchmark, CMS generally pays the plan the benchmark amount, and beneficiaries must pay

an additional premium covering the difference. A higher benchmark can therefore increase CMS's payment to the plan while reducing the premiums its beneficiaries must pay.

65. A low Star Rating may deprive an MAO of significant funding by placing the organization below the statutory payment threshold. For plans with substantial enrollment, even a half-Star difference can have financial consequences measured in the tens or hundreds of millions of dollars.

66. These financial consequences affect beneficiaries as well. Additional rebate funding and QBPs can support more generous supplemental benefits, reduced premiums, lower cost sharing, and investments in programs designed to improve access to care and health outcomes.

67. Star Ratings also affect an MAO's competitive position. CMS publishes both overall and measure-level ratings through publicly accessible resources, including the Medicare Plan Finder, which beneficiaries use to compare available health plans during open enrollment.

68. Medicare beneficiaries, brokers, and other participants in the Medicare Advantage marketplace may rely upon published Star Ratings as indicators of plan quality. Consequently, a lower rating may harm an organization's ability to attract and retain members, diminish its reputation, and undermine its competitive position relative to higher-rated plans. *See Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 6-7 (D.D.C. 2024).

69. CMS's Star Ratings system also identifies certain low-performing contracts, and sustained low performance can carry additional regulatory consequences, including restrictions on enrollment and expansion, and potential contract termination. *See, e.g.*, 42 C.F.R. §§ 422.510(a)(4)(xi), 423.509(a)(4)(x).

### *5. Statutory and regulatory notice-and-comment requirements*

70. Congress imposed specific procedural requirements upon the Secretary's exercise of authority under the Medicare program. Those requirements include a Medicare-specific rule-making regime governing agency actions that establish or change substantive legal standards. *See* 42 U.S.C. § 1395hh; *Azar v. Allina Health Servs.*, 587 U.S. 566, 569-570 (2019).

71. Section 1395hh(a)(2) provides that "[n]o rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1)."

72. Congress thus deliberately imposed specific statutory rulemaking obligations above and beyond the ordinary requirements of the APA for any rules, requirements, or other statements of policy that change substantive Medicare legal standards. *Allina*, 587 U.S. at 569-570, 579.

73. Thus, by statute, any CMS mandate affecting or changing a substantive legal standard must first be proposed in the Federal Register with a public notice period of at least 60 days. 42 U.S.C. § 1395hh(b)(1). And the final published regulation must be a logical outgrowth of that proposal. *Id.* § 1395hh(a)(4).

74. In addition to those statutory requirements, CMS has promulgated regulations governing the adoption, modification, and removal of Star Ratings measures. *See* 42 C.F.R. §§ 422.164, 423.184.By regulation, CMS must announce potential new Part C and Part D measures and solicit feedback in advance of the measurement period and then propose and finalize new measures through rulemaking. 42 C.F.R. §§ 422.164(c)(2), 423.184(c)(2).

75. New Part C and Part D measures must also appear on a public display page for at least two years before being included in the Star Ratings calculation. 42 C.F.R. §§ 422.164(c)(3), 423.184(c)(3).

76. CMS must also promulgate substantive updates to existing measures that do not fall within the non-substantive-update carveouts through defined processes, and place updated measures on the display page for at least two years prior to using the updated measure to calculate and assign Star Ratings. 42 C.F.R. §§ 422.164(d)(2), 423.184(d)(2).

77. CMS's regulatory framework therefore recognizes that adopting new measures and materially altering existing measure specifications warrant formal rulemaking and advance public notice. The regulations distinguish these changes from specified non-substantive updates. 42 C.F.R. §§ 422.164(d)(1), 423.184(d)(1).

78. Nevertheless, CMS has historically declined to codify the complete list of Star Ratings measures and their specifications in the Code of Federal Regulations. In a 2018 rulemaking, CMS explained that it would not codify such a list because of the regular updates and revisions it anticipated making to the measures. *See* 83 Fed. Reg. 16440, 16537 (Apr. 16, 2018).

79. Instead, CMS has continued to publish applicable measures and specifications through annual Technical Notes and related sub-regulatory guidance. The detailed specifications necessary to calculate particular measures are not codified in the Code of Federal Regulations.

80. The specifications of individual measures affect the measure-level scores and ratings assigned to participating contracts. Those measure-level ratings, in turn, affect the overall Star Ratings that determine the statutory payments available to MAOs under §§ 1395w-23(o) and 1395w-24(b)(1)(C).

### 6. *The 2027 Star Ratings and annual payment cycle*

81. The Star Ratings serve both to inform beneficiaries about available plans and to determine subsequent Medicare Advantage payments.

82. CMS calculates and publishes Star Ratings annually in October of the calendar year preceding the year identified by the rating—e.g., CMS published the 2027 Star Ratings in fall 2026, ahead of open enrollment for the 2027 coverage year.

83. Star Ratings reflect performance data from prior measurement periods—e.g., the 2027 Star Ratings published in 2026 are primarily based on data measured in 2024 and 2025.

84. The relevant payment consequences generally follow the Star Rating year by a year—i.e., the 2027 Star Ratings will govern bids for the 2028 contract year and 2028 quality bonus payments.

85. MAOs submit their bids for the upcoming contract year no later than the first Monday in June of the preceding calendar year, making bids for 2028 due June 7, 2027. *See* 42 C.F.R. § 422.254(a)(1); Ctrs. for Medicare & Medicaid Servs., *Final Contract Year 2027 Standards for Part C Benefits, Bid Review and Evaluation* 2 (Apr. 22, 2026).

86. Under 42 C.F.R. § 422.260, MAOs may seek administrative reconsideration of certain QBP status determinations, including qualifying calculation errors or incorrect data. But Section 422.260(c)(3)(ii) expressly excludes administrative review of the methodology used to calculate Star Ratings, the cut points used to determine measure thresholds, and the set of measures included in the Star Ratings system.

87. The administrative review process available to an MAO thus does not permit a challenge to CMS's statutory authority to include particular measures or to CMS's compliance with notice-and-comment obligations in adopting those measures. *See SCAN*, 2024 WL 2815789, at *4 n.3.

### *7. Judicial decisions concerning the Star Ratings system*

88. Federal courts have previously identified serious legal deficiencies in CMS's Star Ratings methodology and its compliance with governing statutory and regulatory requirements.

89. In 2024, two judges of this Court concluded that CMS had acted contrary to its governing regulations when calculating aspects of the 2024 Star Ratings. *See SCAN*, 2024 WL 2815789, at *6; *Elevance*, 736 F. Supp. 3d at 25.

90. Although those decisions provided relief only to the plaintiffs before the court, CMS subsequently recalculated the relevant 2024 Star Ratings for other Medicare Advantage contracts as well. CMS announced that recalculation in a June 2024 memorandum and permitted affected organizations to submit revised bids. Ctrs. for Medicare & Medicaid Servs., *Update to 2025 Quality Bonus Payment Determinations* (June 13, 2024), perma.cc/6MX2-4T4Z.

91. On May 27, 2026, the Southern District of Georgia resolved a challenge from Clover Insurance Company to twenty measures used in calculating Clover's 2026 Star Ratings. It held that CMS had unlawfully relied on the 20 challenged measures. *Clover*, 2026 WL 1483515, *on reconsideration in part*, 2026 WL 1510382 (S.D. Ga. May 29, 2026).

92. *First*, the Court concluded that Section 1395w-23(o)(4)(A)'s instruction that measures should be "based on data collected under section 1395w-22(e) of this title" limited CMS to "consider *only* data collected pursuant to [s]ection 1395w-22(e) in the Star Rating calculus." *Clover*, 2026 WL 1483515, at *8, 10. CMS exceeded that statutory limitation by relying upon ten measures derived from unauthorized data sources, including (among others) prescription drug event data, call-center monitoring data, and independent review entity data. *Id.* at *8-9.

93. *Second*, the court held that ten additional measures were unlawfully included in Clover's 2026 Star Rating because CMS had not promulgated them through notice-and-comment rulemaking as required by Section 1395hh(a)(2). *Clover*, 2026 WL 1483515, at *22-25.

94. The Court concluded that measure specifications fall within the statutory rulemaking requirement because they establish substantive legal standards governing payment for services. *Clover*, 2026 WL 1483515, at *23-24. As the court explained, the measures serve as a "deciding principle" for statutory payments that MAOs receive. *Id.*

95. The Court accordingly vacated Clover's 2026 Star Rating and directed CMS to recalculate that rating consistent with its holdings. *Clover*, 2026 WL 1483515, at *25-26.

96. On July 21, 2026, CMS appealed the *Clover* judgment to the United States Court of Appeals for the Eleventh Circuit. *See Clover Ins. Co. v. HHS*, No. 2:25-cv-00142 (S.D. Ga.), ECF No. 67 (July 21, 2026). At CMS's request, the Eleventh Circuit expedited the appeal and has scheduled oral argument for the week of January 18, 2027. *See Clover Insurance Co. v. HHS*, No. 26-12553 (11th Cir.), Revised Notice to Counsel or Parties (Sept. 21, 2026).

97. Although CMS appealed the *Clover* judgment, it did not immediately seek a stay of the district court's order. Instead, CMS complied with that order by recalculating Clover's 2026 Star Rating. The appeal has not vacated the district court's judgment, which remains operative and binding upon the parties.

98. Following the *Clover* decision, CMS issued a memorandum announcing that it would recalculate QBP ratings for some MAOs. Ctrs. for Medicare & Medicaid Servs., *Update to 2027 Quality Bonus Payment Determinations* (June 17, 2026), perma.cc/G2K9-2LZ8 (June 17 CMS Memo). As part of this recalculation for 2027 QBPs, CMS "removed all the Part D measures" and several "Part C measures" from its data set because these measures were based on non-Section 1395w-22(e) data sources. *Id.* at 1; Ctrs. for Medicare & Medicaid Servs., *Medicare 2026 Part C & D Star Ratings Technical Notes* 112 (Sept. 25, 2025), perma.cc/6SQ7-WNJ2 (2026 Technical Notes) (listing the primary data sources for the 12 Part D measures); *Clover*, 2026 WL 1483515,

at *9 (explaining that D05 and D06, the two measures in CMS's technical notes that purport to be based primarily on CAHPS data, are not in fact based on "data collected under section 1395w-22(e))" (quoting 42 U.S.C. § 1395w-23(o)(4)(A)). CMS also adopted a hold-harmless approach under which contracts would not receive a lower QBP rating as a consequence of the recalculation. June 17 CMS Memo.

99. In the June 17 CMS Memo, CMS declined to remove the ten measures that the *Clover* Court separately held unlawful for failure to comply with Section 1395hh(a)(2)'s rulemaking requirements. As a result, CMS's recalculation for other MAOs did not implement both of the grounds upon which the court had ordered relief for Clover.

100. CMS has now continued to employ many of the same measures invalidated by *Clover* to calculate the 2027 Star Ratings.

101. On information and belief, CMS also excluded the measures held unlawful in *Clover* when calculating Clover's 2027 Star Ratings, although the judgment addressed Clover's 2026 Star Rating. *See* Clover Health Investments, Corp. Form 8-K (Oct. 8, 2026), perma.cc/RC7R-FLQW. But CMS retained unlawful, harmful measures when calculating Banner's 2027 Star Ratings.

**B. Factual background**

102. Banner provides Medicare Advantage coverage to over 18,350 beneficiaries in Arizona through CMS Contract Nos. H4931 and H5843.

103. On October 8, 2026, CMS published the 2027 Medicare Part C and D Star Ratings. CMS assigned H4931 a 3.5 overall Star Rating and assigned H5843 a 3.0 overall Star Rating. *See* Ex. 2. These ratings will determine the QBPs and rebate percentages applicable to Banner's contracts for the 2028 Medicare Advantage contract year.

104. In calculating these ratings, CMS relied upon measures that were unlawful for two reasons. First, CMS included measures based upon data not collected pursuant to 42 U.S.C. § 1395w-22(e), contrary to the restriction imposed by 42 U.S.C. § 1395w-23(o)(4)(A). *Clover*, 2026 WL 1483515, at *8-14. Second, CMS included measures whose specifications had not been promulgated through the notice-and-comment rulemaking required by 42 U.S.C. § 1395hh(a)(2). *Id.* at *22-25.

105. On October 21, 2026, Banner submitted written requests asking CMS to redetermine its 2027 Star Ratings for H4931 and H5843 by removing the unlawful measures that harmed its Star Ratings. Exs. 1, 2. Banner explained to CMS that its reliance on the challenged measures violated (1) the data-source restriction in 42 U.S.C. § 1395w-23(o)(4)(A) and/or (2) the notice-and-comment requirement in 42 U.S.C. § 1395hh(a)(2). *Id.*

106. For H4931, Banner identified the following unlawful measures that must be removed from its 2027 Star Ratings:

- C01 - Breast Cancer Screening
- C02 - Colorectal Cancer Screening
- C10 - Osteoporosis Management in Women who had a Fracture
- C11 - Diabetes Care, Eye Exam
- C12 - Diabetes Care, Blood Sugar Controlled
- C14 - Controlling Blood Pressure
- C16 - Improving Bladder Control
- C26 - Care Coordination
- C31 - Reviewing Appeals Decisions
- D10 - Medication Adherence for Cholesterol (Statins)

Ex. 1 at Ex. A.

107. For H5843, Banner identified the following unlawful measures that must be removed from its 2027 Star Ratings:

- C04 - Improving or Maintaining Physical Health
- C11 - Diabetes Care, Eye Exam
- C15 - Reducing the Risk of Falling
- C18 - Statin Therapy for Patients with Cardiovascular Disease
- C21 - Getting Needed Care
- C22 - Getting Appointments and Care Quickly
- C24 - Rating of Health Care Quality
- C25 - Rating of Health Plan
- C26 - Care Coordination
- C31 - Reviewing Appeals Decisions

Ex. 2 at Ex. A.

108. On October 26, 2026, CMS denied both of Banner's requests. Exs. 3, 4. CMS rejected Banner's request to exclude the challenged unlawful measures from its 2027 Star Ratings. It concluded unequivocally: "CMS is not excluding any of these measures from the 2027 Star Ratings." *Id.*

109. Notably, CMS offered no substantive explanation as to how each challenged measure complied with 42 U.S.C. § 1395w-23(o)(4)(A) and the notice-and-comment requirement in 42 U.S.C. § 1395hh(a)(2). Ex. 3; Ex. 4.

**BANNER'S 2027 STAR RATINGS ARE UNLAWFUL**

110. CMS's calculations of Banner's 2027 Star Ratings are based on unlawful measures and must be recalculated without the offending measures.[1]

**A. CMS unlawfully relied on data that Congress did not authorize.**

111. Congress expressly mandated that Star Ratings used to determine QBPs be based on data collected under 42 U.S.C. § 1395w-22(e). *Id.* at § 1395w-23(o)(4)(A). Yet CMS included measures in Banner's challenged 2027 Star Ratings that rely on data outside that provision's scope. In particular:

(a) Reviewing Appeals Decisions (C31) relies on Independent Review Entity (IRE) data.

(b) Medication Adherence for Cholesterol (Statins) (D10) relies on Part D prescription drug event data. 2026 Technical Notes at 111-112; 2027 Technical Notes at 130-131.

112. As the court held in *Clover*, CMS cannot determine Star Ratings using measures based on data Congress did not authorize for that purpose. *Clover*, 2026 WL 1483515, at *8-14.

113. Indeed, CMS has acknowledged these measures are based on unlawful data sources. In the June 17 CMS Memo, CMS excluded both measures from its limited recalculation of 2027 QBP ratings based on 2026 Star Ratings. June 17 CMS Memo (excluding then-C32 and D10). But CMS nonetheless included those same measures in calculating Banner's 2027 Star Ratings.

114. CMS's modifications to the 2027 "Reviewing Appeals Decisions" measure did not fix the problem; CMS continues to calculate that measure using IRE data, employing additional

---

[1] Although Banner maintains that CMS unlawfully calculated both its 2026 and 2027 Star Ratings (*see* Exs. 1, 2), Banner seeks judicial relief only as to its 2027 Star Ratings.

Part C reporting data only to assess the completeness of the IRE submissions and impose scaled reductions where data-integrity problems were identified. 2027 Technical Notes at 7, 85, 130. Thus, CMS continues to rely on the same unauthorized categories of data that *Clover* held unlawful and that CMS acknowledged were unlawful as to its limited recalculation of 2026 Star Ratings.

**B. CMS failed to comply with statutory and regulatory notice-and-comment requirements.**

115. Independently, CMS calculated Banner's 2027 Star Ratings using measures whose operative specifications were unlawfully promulgated without notice-and-comment rulemaking. In fact, none of the measures that Banner challenged were promulgated by notice-and-comment rulemaking and codified into the Code of Federal Regulations.

116. The unlawfully promulgated measures harmfully applied to each of Banner's contracts are as follows:

- For H4931: C01, C02, C10, C11, C12, C14, C16, C26, C31, and D10.
- For H5843: C04, C11, C15, C18, C21, C22, C24, C25, C26, and C31.

117. Section 1395hh(a)(2) requires CMS to promulgate by regulation any requirement or statement of policy that establishes or changes a substantive legal standard governing Medicare payment. Star Ratings measure specifications satisfy that standard because they determine the QBPs and rebates available to MAOs. *Clover*, 2026 WL 1483515, at *22-25; *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017), *aff'd sub nom. Azar v. Allina Health Servs.*, 587 U.S. 566 (2019); *SCAN*, 2024 WL 2815789, at *7 ("CMS's failure to follow its own regulation led it to give SCAN an incorrect Star Rating that will cost the organization millions of dollars"); *Elevance*, 736 F. Supp. 3d at 6, 15-18.

118. The specifications also establish substantive legal standards governing the scope of Medicare benefits and the eligibility of organizations to furnish Medicare services or benefits. By

determining benchmark adjustments and rebate funding, Star Ratings determine the resources available for supplemental benefits and reductions in premiums and cost-sharing. 42 U.S.C. §§ 1395w-23(o), 1395w-24(b)(1)(C). Star Ratings also supply standards governing continued program participation, including potential termination after sustained low performance. 42 C.F.R. §§ 422.510(a)(4)(xi), 423.509(a)(4)(x). Each of these is an independent reason why Section 1395hh(a)(2) required promulgation in a regulation.

119. CMS cannot establish compliance simply by pointing to prior Federal Register announcements identifying challenged measures. Although CMS listed measure names and high-level descriptions in a 2018 rulemaking, it did not promulgate into regulation the detailed specifications necessary to calculate those measures. *See AT&T Corp. v. Fed. Commc'ns Comm'n*, 970 F.3d 344, 350 (D.C. Cir. 2020) ("Publication in the Federal Register does not suggest that the matter published was meant to be a regulation, since the APA requires general statements of policy to be published as well."). Instead, CMS expressly announced that it would not codify the measures and specifications in regulatory text because it anticipated revising and updating them regularly. 83 Fed. Reg. 16440, 16537 (Apr. 16, 2018). CMS continues to publish the operative specifications—including calculation methodologies, applicable populations, numerators, denominators, and exclusions—in annually updated Technical Notes and other sub-regulatory materials.

120. The Court in *Clover* has already held that seven of the 17 measures unlawfully applied to Banner in the 2027 Star Ratings—C04, C15, C16, C22 (now C21), C23 (now C22), C25 (now C24), and C27 (now C26)—violated Section 1395hh(a). And the Court in *Clover* has already held that two of the measures unlawfully applied to Banner in the 2027 Star Ratings—C32 (now C31) and D10—violate the data-source restriction of Section 1395w-23(o)(4)(A). *Clover*, 2026 WL 1483515, at *8-14, *22-25.

121. The eight additional measures that CMS harmfully applied to Banner in its 2027 Star Ratings—C01, C02, C10, C11, C12, C14, C18, and C25—are materially indistinguishable and unlawful for the same reasons. In particular, the specifications for these additional measures establish substantive criteria governing Banner's ratings and payments but were not promulgated by regulation.

122. As examples:

(a) Breast Cancer Screening (C01) depends on specified eligibility criteria, a measurement period, the definition of a qualifying mammogram, and exclusions—all of which are described in sub-regulatory guidance. *See* 2027 Technical Notes at 31-33.

(b) Colorectal Cancer Screening (C02) similarly depends on operative eligibility, screening, and exclusion criteria—all of which are described in sub-regulatory guidance. *See* 2027 Technical Notes at 33-35.

123. CMS's own regulations impose additional independent procedural requirements for new measures and substantive updates. 42 C.F.R. §§ 422.164(c)(2)-(3), (d)(2), 423.184(c)(2)-(3), (d)(2). CMS violated its own regulations by introducing and/or substantively revising some or all of these measures without complying with these requirements. *Nat'l Env't Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is 'axiomatic'" that "an agency is bound by its own regulations" (citation modified)); *Elevance*, 736 F. Supp. 3d at 23-25; *SCAN*, 2024 WL 2815789, at *4-7.

124. Because CMS never proposed the operative specifications for the challenged measures in a notice of proposed rulemaking, Banner had no opportunity to comment on the standards that determined its measure scores. Those standards affected Banner's measure scores and the resulting ratings and payment determinations.

**C. CMS's inclusion of the challenged measures is arbitrary and capricious.**

125. CMS's treatment of Banner in its 2027 Star Ratings is also arbitrary and capricious for three independent reasons.

126. *First*, CMS's treatment of Banner is arbitrary and capricious because it treats similarly situated parties differently. *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023). For the 2027 Star Ratings, on information and belief, CMS calculated Clover's 2027 Star Ratings by excluding unlawful measures that Clover challenged in litigation over its 2026 Star Ratings. *See* Clover Health Investments, Corp. Form 8-K (Oct. 8, 2026), perma.cc/RC7R-FLQW.

127. CMS told Banner that "The 2027 Star Ratings include all applicable measures listed in Attachment VI, Table VI-1 pages 105-110 of the Announcement of Calendar Year (CY) 2027 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies available at https://www.cms.gov/files/document/2027-announcement.pdf. CMS is not excluding any of these measures from the 2027 Star Ratings." Exs. 3, 4.

128. CMS, however, *is* apparently excluding some of those measures that are harmful to Clover—but not doing so for Banner (or other MAOs). CMS cannot treat similarly situated MAOs differently without a valid reason for doing so. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024-1026 (D.C. Cir. 2018).

129. Adjusting the calculation methodology for only Clover threatens the integrity of the Star-Ratings system as a whole. In calculating Star Ratings, CMS groups contracts according to their relative performance. 42 C.F.R. §§ 422.166(a)(1)-(2), 423.186(a)(1)-(2). The measure-level

Star Rating assigned to a contract may depend not only upon the contract's own performance but also upon the performance of other contracts in the relevant comparison group. Thus, excluding measures for one MAO but not for others could impact the Star Ratings of all the contracts in that MAO's contract group, creating widespread inconsistency.

130. *Second*, not only is CMS treating similarly situated MAOs differently, it is also departing from past practice without justification. CMS's refusal to provide comparable relief departs from its response to earlier adverse Star Ratings decisions in 2024. There, CMS extended the benefit of those decisions to MAOs industry-wide rather than limiting relief to the prevailing plaintiffs. Ctrs. for Medicare & Medicaid Servs., *Update to 2025 Quality Bonus Payment Determinations* 1 (June 13, 2024), perma.cc/6MX2-4T4Z. For 2027 Star Ratings, CMS has not followed this practice on an industry-wide basis, instead asserting that "[t]he 2027 Star Ratings include all applicable measures listed in Attachment VI, Table VI-1 pages 105-110 of the Announcement of Calendar Year (CY) 2027 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies available at https://www.cms.gov/files/document/2027-announcement.pdf. CMS is not excluding any of these measures from the 2027 Star Ratings." Exs. 3, 4. CMS has failed to offer a reasonable explanation as to why it has chosen to depart from its past practice of extending the benefits of court rulings invalidating Star Ratings as to specific plaintiffs to all affected MAOs. S*ee Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856-859 (D.C. Cir. 2019) ("'A full and rational explanation' becomes 'especially important' when, as here, an agency elects to … 'depart[] from its typical manner of' administering a program.") (quoting *Great Lakes Gas Transmission Ltd. P'ship v. FERC*, 984 F.2d 426, 433 (D.C. Cir. 1993)).

131. *Third*, CMS's conduct is arbitrary and capricious because it failed to provide a reasoned response to Banner's objections that the challenged measures were based on unlawful data and had not been promulgated as required by Section 1395hh(a)(2).

132. CMS nowhere identified how each measure was based on appropriate data, nor did it identify any regulation that purportedly authorized those measures. Exs. 3, 4. Nor did CMS identify any material distinction between the 2027 Star Ratings that Banner challenged and those the Court held unlawful in *Clover*. *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) ("[W]here, as here, a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument."). Instead, CMS stated categorically that "CMS is not excluding any of these measures from the 2027 Star Ratings" and directed Banner to sub-regulatory guidance that predates the *Clover* decision. Exs. 3, 4. CMS has thus not reasonably explained its inclusion of the harmful unlawful measures in Banner's 2027 Star Ratings in light of the *Clover* decision that Banner specifically raised.

133. CMS's reasoning that it is categorically not excluding any such measures is further not a reasoned explanation considering that CMS appears to have in fact excluded measures from Clover's 2027 Star Ratings. *Supra* ¶ 101; *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise.").

**CMS'S UNLAWFUL STAR RATINGS CAUSE SIGNIFICANT HARM TO BANNER**

134. CMS's unlawful calculation of Banner's 2027 Star Ratings has caused—and will continue to cause—substantial financial, competitive, and reputational harm to Banner and its members.

135. CMS assigned Contract No. H4931 a 3.5 Star Rating for 2027. Ex. 1. If CMS had properly excluded the ten challenged measures, it would have assigned H4931 at least a 4.0 Star Rating in 2027. *Id.* CMS's use of unlawful measures deprived Banner of Star Ratings to which it is entitled.

136. CMS assigned Contract No. H5843 a 3.0 Star Rating for 2027. Ex. 2. If CMS had properly excluded the ten challenged measures, it would have assigned H5843 at least a 4.0 Star Rating in 2027. *Id.* CMS's use of unlawful measures deprived Banner of Star Ratings to which it is entitled.

137. The financial consequences of CMS's unlawful calculations are substantial.

138. Banner's 2027 Star Ratings determined its eligibility for QBPs and rebate percentages for contract year 2028. If H4931's and H5843's Star Ratings had been lawfully calculated without the challenged measures, Banner would have been entitled to a five-percentage-point increase in the percentage used for its Medicare Advantage benchmark. 42 U.S.C. § 1395w-23(o). Moreover, correcting H5843's Star Rating from 3.0 to 4.0 Stars would increase its applicable rebate percentage from 50% to 65%. 42 U.S.C. § 1395w-24(b)(1)(C)(v). CMS's unlawful calculations deprived Banner of substantial QBPs and associated rebate funding. Banner estimates that the resulting financial losses will total approximately $28.3 million for contract year 2028.

139. These financial losses affect not only Banner as a nonprofit integrated system accountable to the communities it serves but also its Medicare beneficiaries. QBPs and rebates provide resources that MAOs can use to offer enhanced supplemental benefits, reduce premiums and beneficiary cost-sharing, and invest in improvements to care coordination and quality. CMS's unlawful methodology does not merely reduce Banner's revenue. It reduces the resources available within an integrated delivery system to provide affordable, coordinated Medicare coverage and

care to Arizona beneficiaries. By unlawfully reducing the funding available to Banner, CMS has impaired Banner's ability to offer its members the most comprehensive benefits at the lowest cost.

140. This is especially so because Banner's Medicare Advantage plans are part of a non-profit, integrated healthcare system in which financing, care delivery, care coordination, and population health and quality improvement operate within the same enterprise. Banner uses the Medicare Advantage funds it receives to ensure that resources are available to support benefits and initiatives intended to improve beneficiaries' access, affordability, and health outcomes. The harm is most acute for the approximately 10,850 dual-eligible members enrolled in H4931, many of whom live in rural Arizona counties. Because Medicaid covers much of their Medicare cost-sharing, rebate dollars primarily fund the supplemental benefits these members rely on, such as transportation to medical appointments, food and produce support, over-the-counter health items, and dental, vision, and hearing coverage. As an integrated organization, Banner is uniquely well-positioned to translate Medicare Advantage funds into better holistic care for its members.

141. CMS's publication of Banner's inaccurate Star Ratings has independently harmed Banner's reputation and goodwill. CMS publicly reports both overall and individual-measure Star Ratings through its Medicare Plan Finder tool and represents those ratings to beneficiaries as indicators of plan quality. Medicare beneficiaries, insurance brokers, and other market participants rely on those ratings when evaluating and selecting plans. By assigning Banner lower ratings based on unlawful measures, CMS has inaccurately portrayed Banner's plans as providing lower-quality care than competing plans, notwithstanding that the published ratings do not reflect a lawful evaluation of Banner's performance.

142. This reputational harm has concrete competitive consequences. Lower Star Ratings can discourage prospective members from enrolling, affect members' decisions to remain enrolled,

and cause brokers and third-party marketing organizations to favor higher-rated plans. The resulting harm extends beyond the payment calculations themselves and may persist even after the ratings are corrected.

143. Banner has suffered and will continue to suffer substantial injury from CMS's unlawful calculations of its 2027 Star Ratings. Unless those calculations are set aside and the ratings recalculated without the unlawful measures, Banner will continue to be deprived of the financial benefits associated with its lawful ratings and will continue to suffer competitive and reputational harm.

144. Banner's requested relief is time sensitive: Banner seeks a decision and recalculation sufficiently in advance of the June 7, 2027, bidding deadline to permit bids reflecting a lawful calculation of its 2027 Star Ratings. Banner therefore requests judicial relief on a timetable that will enable it to secure effectual relief from the unlawfully calculated 2027 Star Ratings.

## CLAIMS FOR RELIEF

### COUNT I
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### (Agency Action Not in Accordance with Law and in Excess of Statutory Authority)

145. Banner incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

146. Under the APA, a reviewing court must hold unlawful and set aside agency action that is not in accordance with the law, in excess of statutory jurisdiction or authority, or in violation of statutory limitations. 5 U.S.C. § 706(2)(A), (C).

147. Congress expressly limited the data that CMS may use to determine Medicare Advantage Star Ratings for QBP purposes to "data collected under section 1395w-22(e)." 42 U.S.C. § 1395w-23(o)(4)(A). As the court held in *Clover*, 2026 WL 1483515, at *8-14, CMS exceeds this

statutory limitation when it calculates Star Ratings using measures derived from data that falls outside of Section 1395w-22(e)'s scope.

148. CMS violated that limitation in calculating Banner's challenged 2027 Star Ratings. CMS included Reviewing Appeals Decisions (C31) in the 2027 Star Ratings for Contracts H4931 and H5843 and Medication Adherence for Cholesterol (Statins) (D10) in the 2027 Star Ratings for Contract H4931. Those measures rely, respectively, on IRE data and Part D prescription drug event data rather than data collected under Section 1395w-22(e). They therefore cannot lawfully be included in Banner's 2027 Star Ratings.

149. CMS's determination of Banner's 2027 Star Ratings using measures based on unauthorized data is not in accordance with the law and exceeds CMS's statutory authority in violation of 5 U.S.C. § 706(2)(A) and (C).

**COUNT II**
**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)**
**(Agency Action Taken Without Observance of Procedure Required by Law)**

150. Banner incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

151. The APA requires a reviewing court to hold unlawful and set aside agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

152. Section 1395hh(a)(2) requires CMS to promulgate any rule, requirement, or statement of policy establishing or changing a substantive legal standard governing the scope of Medicare benefits, payment for services, or eligibility to furnish or receive services or benefits through notice-and-comment rulemaking. 42 U.S.C. § 1395hh(a)(2). Because Star Ratings determine how much an MAO will receive in QBPs and rebates, the specifications that determine those ratings establish substantive legal standards governing Medicare payments. *See Allina*, 587 U.S. at 570-

581; *Clover*, 2026 WL 1483515, at *22-25. Independently, the specifications establish standards governing benefits and continued program participation. *See supra* ¶ 69.

153. CMS failed to comply with this statutory requirement when determining Banner's challenged 2027 Star Ratings. CMS did not properly promulgate the operative specifications for the challenged measures for H4931—C01, C02, C10, C11, C12, C14, C16, C26, C31, and D10—and for H5843—C04, C11, C15, C18, C21, C22, C24, C25, C26, and C31—in a regulation. Instead, CMS relied on annually updated Technical Notes and other sub-regulatory materials to establish or change the substantive criteria governing Banner's 2027 Star Ratings.

154. Independently, CMS's regulations require advance feedback, rulemaking, and a two-year display period for new measures and substantive updates not covered by their non-substantive-update provisions. 42 C.F.R. §§ 422.164(c)(2)-(3), (d)(1)-(2), 423.184(c)(2)-(3), (d)(1)-(2). CMS failed to comply with the applicable requirements for additions or substantive updates for some or all of the challenged measures.

155. CMS's reliance on measures whose operative specifications were not promulgated through legally required procedures renders Banner's 2027 Star Ratings unlawful under 5 U.S.C. § 706(2)(A) and (D).

**COUNT III**
**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)**
**(Arbitrary and Capricious Agency Action)**

156. Banner incorporates by reference the preceding factual allegations of this Complaint as though fully set forth herein.

157. The APA requires agencies to treat similarly situated regulated entities consistently or to provide a reasoned explanation for differential treatment. *Grayscale*, 82 F.4th at 1245-1247; *ANR*, 904 F.3d at 1024-1026.

158. Agencies must likewise acknowledge and reasonably explain departures from their prior administrative practices. *Sw. Airlines*, 926 F.3d at 856-859.

159. CMS must also provide a reasoned explanation addressing the statutory grounds on which Banner sought correction of its ratings.

160. CMS violated these principles. CMS, on information and belief, voluntarily excluded harmful unlawful measures from Clover's 2027 Star Ratings (even though the Southern District of Georgia's judgment only addressed 2026 Star Ratings) while retaining harmful unlawful measures in Banner's 2027 Star Ratings. And the only explanation it offered to Banner was that "CMS is not excluding any of these measures from the 2027 Star Ratings"—when it apparently was doing so for Clover.

161. CMS's treatment of Banner departed from its prior administrative practice. Following adverse court decisions on Star Ratings in 2024, CMS recalculated the affected ratings and extended the resulting benefits to all affected MAOs. CMS has departed from that practice by failing to apply the same approach to all affected MAOs and has offered no explanation for adopting a different and more limited approach that benefits only Clover.

162. Finally, CMS failed to offer a reasoned explanation in response to Banner's letters identifying the harmful unlawful measures that should not be included in its 2027 Star Ratings. CMS's October 26 denials did not address Banner's objections, did not identify any regulation adopting any of the challenged measures, and did not explain how each measure rested only on proper data sources.

163. CMS's differential treatment of Banner for the 2027 Star Ratings, unexplained departure its from prior practice of affording industry-wide relief in response to judicial decisions, and failure to provide a reasoned explanation in response to Banner's reasons why the harmful

unlawful measures must be removed from its 2027 Star Ratings are arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Banner respectfully requests that the Court enter judgment in its favor and that the Court:

(a) Declare, pursuant to 28 U.S.C. § 2201, that CMS's inclusion of Reviewing Appeals Decisions (C31) in the 2027 Star Ratings for Contracts H4931 and H5843 and Medication Adherence for Cholesterol (Statins) (D10) in its calculation of Banner's 2027 Star Ratings for Contract H4931 violated 42 U.S.C. § 1395w-23(o)(4)(A);

(b) Declare, pursuant to 28 U.S.C. § 2201, that CMS's inclusion of C01, C02, C10, C11, C12, C14, C16, C26, C31, and D10 in the 2027 Star Ratings for H4931 violated 42 U.S.C. § 1395hh(a)(2) and/or 42 C.F.R. §§ 422.164 and 423.184;

(c) Declare, pursuant to 28 U.S.C. § 2201, that CMS's inclusion of C04, C11, C15, C18, C21, C22, C24, C25, C26, and, C31 in the 2027 Star Ratings for H5843 violated 42 U.S.C. § 1395hh(a)(2) and/or 42 C.F.R. §§ 422.164 and 423.184;

(d) Declare that CMS acted arbitrarily and capriciously by:

i. Excluding unlawful measures from Clover's 2027 Star Ratings while retaining the harmful unlawful measures for H4931 and H5843 in Banner's 2027 Star Ratings without adequate explanation;

ii. Departing from its past practice of extending the benefits of court decisions to all MAOs by recalculating 2027 Star Ratings only for Clover but not Banner and without acknowledging or explaining the departure;

iii. Failing to provide a reasoned explanation for refusing to remove the unlawful measures Banner identified from the 2027 Star Ratings for H4931 and H5843;

(e) Hold unlawful and set aside Banner's challenged 2027 Star Ratings for Contract Nos. H4931 and H5843 and CMS's October 26, 2026, denials of Banner's requests for correction to the extent inconsistent with the Court's judgment;

(f) Remand to CMS with instructions to recalculate H4931's overall (and any affected summary) 2027 Star Ratings without challenged unlawful measures—C01, C02, C10, C11, C12, C14, C16, C26, C31, and/or D10—including any derivative calculation that would otherwise carry forward the unlawful measures' effect;

(g) Remand to CMS with instructions to recalculate H5843's overall (and any affected summary) 2027 Star Ratings without challenged unlawful measures—C04, C11, C15, C18, C21, C22, C24, C25, C26, and/or C31—including any derivative calculation that would otherwise carry forward the unlawful measures' effect;

(h) Direct CMS to calculate (or recalculate) Banner's applicable 2028 QBPs, benchmarks, rebates, and resulting payments based on the corrected 2027 Star Ratings and to implement all resulting payment adjustments consistent with the Court's judgment;

(i) Order CMS, on a timetable set by the Court, to take all necessary and appropriate steps to effectuate the corrected Star Ratings, QBPs, benchmarks, rebates, and resulting payments, including facilitating the submission or modification of Medicare Advantage bids for H4931 and H5843;

(j) Direct CMS to correct its publicly reported Star Ratings and associated agency records for H4931 and H5843 to reflect the lawful ratings determined following recalculation;

(k) Award Banner its reasonable costs and attorneys' fees to the extent permitted by law; and

(l) Grant such other and further declaratory, injunctive, or equitable relief as the Court deems just and proper.

Dated: November 6, 2026

Respectfully submitted,

/s/ *Sarah P. Hogarth*
Sarah P. Hogarth (D.C. Bar No. 1033884)
Charles Seidell (D.C. Bar No. 1670893)
Raine Kennedy (D.C. Bar No. 90030726)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
shogarth@mcdermottlaw.com

*Counsel for Plaintiffs*